UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

D/F

-------------------------------------------------------------------X

OHIO CASUALTY INSURANCE COMPANY,

        Plaintiff,

      -against-

TWIN CITY FIRE INSURANCE COMPANY,

        Defendant.

**MEMORANDUM & ORDER**

**14-CV-858 (NGG) (PK)**

-------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Ohio Casualty Insurance Company ("Ohio Casualty") brings this action against Defendant Twin City Fire Insurance Company ("Twin City"), claiming that Twin City, a primary insurer, breached its duty of good faith and fair dealing to Ohio Casualty, an excess insurer, by failing to settle an underlying personal injury action (the "Underlying Action") within the liability limits of the primary policy. A bench trial was held before me in Brooklyn, New York on April 4, 9, and 10, 2019. For the reasons set forth below, Plaintiff's claim is DENIED, and judgment shall be entered for Defendant.

## I.    FINDINGS OF FACT

### A.    The Insurance Policies

Defendant Twin City, a member company of The Hartford,[1] issued a commercial auto policy to American Recycling Technologies, Inc. ("ART"), providing $1 million in primary coverage, with a policy period of June 17, 2005 to June 17, 2006 (the "Twin City Policy"). (Pretrial Order Stipulated Facts ("Stip. Facts") (Dkt. 103) ¶ 1.) Plaintiff Ohio Casualty, a

---

[1] "Twin City" and "The Hartford" are used interchangeably throughout this decision.

member company of Liberty Mutual,[2] issued an excess liability policy to ART, with a policy period of January 30, 2005 to April 20, 2006, and excess limits of liability in the amount of $4 million (the "Ohio Casualty Policy"). (Id. ¶ 2.) The Ohio Casualty Policy provided excess coverage over the Twin City Policy, both of which were in effect on June 29, 2005. (Id.)

## B. The Motor Vehicle Accident

On June 29, 2005, Juan Sanchez ("Sanchez"), an ART employee, was involved in a motor vehicle accident while operating a truck for ART on the Van Wyck Expressway in Queens, New York. (Id. ¶¶ 3-4; see DX A[3].) At the time of the accident, Sanchez was driving north in the right-hand lane. (Stip. Facts ¶ 5; DX A at '5794[4].) Auguste Shurland ("Shurland") was driving a van directly ahead of Sanchez in the same lane and Osmin Aguilar ("Aguilar") was driving another truck directly behind Sanchez in the same lane. (Stip. Facts ¶ 4; DX A at '5794.) The accident appears to have occurred when Shurland came to an abrupt stop after having been cut off by a vehicle moving into the right-hand lane. (Id. ¶ 6; DX A '5794.) Behind Shurland, Sanchez brought his truck to a stop without contacting Shurland's vehicle. (DX A '5794.) That Sanchez never hit the Shurland vehicle in front of him appears to have been an uncontested fact throughout the life of the Underlying Action. (See Trial Tr.[5] (undocketed) at 55:5-8, 128:6-9, 234:13-18.)

During the Underlying Action, Sanchez maintained that his vehicle never left the right-hand lane and that he was at a full stop for 2-3 seconds before Aguilar's truck collided with the

---

[2] 'Ohio Casualty" and "Liberty Mutual" are used interchangeably throughout this decision.

[3] References to PX__ and DX__ are references to Plaintiff and Defense exhibits, respectively.

[4] Throughout this decision, where an exhibit's pincite is preceded by an apostrophe, the number refers to the last digits of the control number of the particular page cited. Where the pincite is not preceded by an apostrophe, the number refers to the ordinary pagination of the exhibit.

[5] Testimony presented live at trial is designated by transcript cite, "Trial Tr."

rear of his truck. (Stip. Facts ¶ 8.) Aguilar insisted, however, that he was traveling five car

lengths behind Sanchez's vehicle, which he described as a "tractor-trailer," when he first saw its

brake lights come on and smoke coming from its rear tires. (PX 9 at '370.) He alleged that the

trailer of the Sanchez vehicle then "fishtailed," swinging left into the middle lane and then back

into the right lane, striking the front left corner of Aguilar's truck's cab. (Id. at '370-71; DX

XXX at '3408.)

The police report, prepared on the same day as the accident by the responding officer,

depicted a rear-end collision, with the truck driven by Aguilar striking the Sanchez truck in the

rear. (PX A at '5794.) Aguilar's trial attorney, Sharon Scanlan, described this diagram as

"blam[ing] the case on [Aguilar]." (Trial Tr. at 134:8-10.)

Ricardo Hohl, an independent witness who observed the accident, provided several

statements over the course of the litigation. (Stip. Facts ¶ 30.) His description of the event

varied between those statements, but he generally maintained that Sanchez had come to a full

stop before being struck in the rear. (See PX 34A at '36; PX 19CC; DX KKK at '11744; PX

34B at '57-59, 63-64, 79.)

- On July 14, 2005, Hohl said in a written statement: "There was a small white utility pick up truck in the far right lane. It stopped short (slamming on the breaks, screatching [sic] and smoke coming out of the tires, to avoid hitting the exiting vehicle. There was a larger white delivery truck, which also made an attempt to stop. It hit the smaller utility truck in front of him. The larger white truck crashed into the rear right side of the smaller truck." (PX 34A at '36.)

- On June 8, 2006, Hohl told an investigator sent by Twin City: "There was a tractor trailer unit in the right lane which had been [behind] the SUV that had moved into the center lane. The driver of the tractor trailer applied his brakes and brought his vehicle to a complete stop. There was a cargo type truck in the right lane behind the tractor trailer unit. The driver of the cargo truck was not able to stop his vehicle in time and he collided with the rear of the tractor trailer unit." (PX 19CC.)

- On June 20, 2008, Hohl executed an affirmation, in which he attested: "There was a truck in the right lane who applied his brakes and brought his vehicle to a stop

before being struck in the rear by a cargo-type truck behind this truck which was not able to stop his vehicle." (DX KKK at '11744.)

- On January 28, 2011, at his deposition, Hohl testified repeatedly that the Sanchez truck had come to a complete stop before being hit in the rear by the Aguilar truck:

    o When asked if the truck with the trailer was "stopped or moving when the last truck hit it," he responded "The trailer is the one that stopped." (PX 34B at '57.)

    o When asked how long the Sanchez truck had been stopped for, he responded "three seconds maybe, three to four seconds." (Id. at '57-58.)

    o When asked if "The trailer truck was struck in the rear by the box truck," he responded "Right." (Id. at '59.)

    o When asked "Is it your testimony that the tractor-trailer came to a complete stop in the far right lane?" he responded "Yes." (Id. at '63-64.)

    o When asked if "the flatbed was stopped when it was struck in the rear," he responded "Yes." (Id. at '79.)

George Ruotolo, an accident reconstructionist who was retained in the course of the resulting litigation, concluded that the collision was a rear-end impact, with Aguilar striking Sanchez in the rear:

- "[T]he left half of the Aguilar cab had struck the right half of the back of the Sanchez truck." (Ruotolo Dep. Tr.[6] at 22:20-23.)

- "[I]t was reasonable for Mr. Sanchez to decelerate and to stop." (Id. at 24:18-20.)

- Aguilar "was either inattentive, in other words, began to brake too late, or that he was following too closely because there was adequate time and distance for Mr. Sanchez to bring his truck to a stop, yet there was not adequate time and distance for Mr. Aguilar to slow appropriately." (Id. at 25:23-26:12.)

- Photographs of the Aguilar truck showed that it was "not damaged from a side impact from a trailer. That's damaged from striking something like the back of another vehicle, which is consistent with the testimony and the witnesses. . . . This would not occur with trailer sway." (Id. at 36:24-37:10.)

---

[6] Testimony presented via deposition designation is designated by "[name] Dep. Tr."

As a result of the accident, Aguilar sustained serious injuries, including a punctured lung and leg amputation. (Stip. Facts ¶ 9.)

### C. Filing of the Underlying Action

On September 1, 2005, Aguilar brought suit in Supreme Court, Kings County, against several parties, including Sanchez, alleging negligence, in an action titled <u>Osmin Aguilar v. Salem Truck Leasing & Juan Sanchez, et al.</u>, index number 028862/2005 (referred to herein as the "Underlying Action"). (Stip. Facts ¶ 12.) Sanchez brought his own suit against Aguilar based on Aguilar's alleged negligence in causing the accident. (Trial Tr. at 239:7-240:7.)

### D. Twin City's Pre-Trial Handling and Assessment of the Underlying Action

Twin City accepted ART's tender of the claim and retained defense counsel and investigators to investigate and defend the Aguilar claim. (Stip. Facts ¶ 13.) Witnesses in this case did not dispute that Twin City's investigation and defense strategy was reasonable. (<u>See</u> Trial Tr. at 59:20-60:1, 70:20-25, 72:16-19.)

The Aguilar claim was handled by an experienced team at Twin City. The claim was initially assigned to Lynn Schweitzer, who worked in the field office responsible for downstate New York claims. (<u>See</u> PX 18J; Schweitzer Dep. Tr. at 12:6-11.) Schweitzer has thirty years of experience as an insurance claims adjuster at The Hartford, of which Twin City is a member company. (Schweitzer Dep. Tr. at 6:17-21; 8:13-18.)

Bill Turney, a Home Office Consultant at the company's home office in Hartford, Connecticut, also began consulting on the claim in 2006, and in September 2012, Turney took over the claim as a "direct handle." (Trial Tr. at 381:12-17.) Turney practiced law as an insurance defense attorney for nearly twenty years before joining Twin City in 2001. (<u>Id.</u> at 363:4-364:17.) As a Home Office Consultant, he is involved in claims arising in twelve eastern

states, with more than half of the claims he handles originating in New York. (Id. at 367:2-4, 367:23-368:4.) Claims referred to the home office "are cases that involve very serious injuries where there is significant exposure . . . due to the liability limits on the policy that the insured has." (Id. at 367:11-16.)

Turney reported to Michele Vitali. (Id. at 372:7-8.) Like Turney, Vitali practiced law as an insurance defense attorney before joining The Hartford, including working as staff counsel at multiple other insurers. She spent six years at Progressive and three years at Allstate, representing the companies' policyholders in New York cases. (Vitali Dep. Tr. at 5:11-7:9.) She spent her first nine years at The Hartford managing Home Office Consultants with respect to "auto and liability claims for Hartford insureds located across the country." (Id. at 7:17-10:6.)

Twin City initially assigned defense of the Underlying Action to Cohen, Kuhn & Associates ("Cohen Kuhn"). (Stip. Facts ¶ 17.) In May 2006, Twin City transferred defense of the case to Lewis Johs Avallone Aviles, LLP ("Lewis Johs"). (Id. ¶ 20.) The day-to-day handling of the file was assigned to John Horan, an attorney with roughly two decades of experience representing defendants in hundreds of auto accidents. (Id.; Trial Tr. at 233:14-20.)

Aguilar was represented in the Underlying Action by Jacoby & Myers, first by Michael Finkelstein and after February 2012, by Sharon Scanlan. (Stip. Facts ¶¶ 21-22.)

1.    Twin City's Assessment of Liability

In New York, there is a presumption that the following vehicle in a rear-end collision is liable. See, e.g., Polonia v. Dunphy, 2012 WL 2376467, at *3 (S.D.N.Y. June 21, 2012) ("It is well established law that a rear-end collision with a stopped vehicle establishes a prima facie case of negligence on part of the driver of the second vehicle."). Thus, as Scanlan testified, it is unusual for the driver of the following vehicle to bring an action against the driver of the lead

vehicle. (Trial Tr. at 128:19-129:5.) Indeed, as Horan testified, it is not unusual for the plaintiff driver of the lead vehicle to move for summary judgment and prevail. (Id. at 276:16-277:1.) Both Michael Finkelstein and Scanlan testified that there were no grounds on which Aguilar could have moved for summary judgment on liability, because he was the following driver. (Id. at 172:12-20; Michael Finkelstein Dep. Tr. ("M. Finkelstein Dep. Tr.") at 40:25-41:9.)

Jacoby & Meyers similarly recognized it could be difficult to prevail, but nonetheless took on the representation of Aguilar because the severity of his injuries meant it could be valuable. Under New York's "pure" comparative fault regime, a plaintiff like Aguilar can recover a proportional share of his total damages. (See Trial Tr. at 140:16-21; Stip. Facts ¶ 36.) Scanlan explained at trial that she believed that Aguilar's injuries were potentially valued at $8 million and "if everything lined up, we might be able to tag the front car for a small percentage but a small percentage of an injury like that is still a significant amount of money." (Trial Tr. at 130:4-9, 139:12-16, 140:2-15.) Based on the facts of the accident, Scanlan testified at this trial that it would have been a "home run" if a jury had assessed as little as 25 percent liability on the defendant. (Trial Tr. at 140:18-23.)

Andrew Finkelstein,[7] the managing partner of Jacoby & Meyers, testified that he had been actively involved in Aguilar's case, although he generally "oversee[s] only a few" cases. (Id. at 199:6-8, 210:13-18, 216:24-25.) While he was confident that his firm would get a good outcome for Aguilar, he testified that he could "easily see how most people would say, [']your client hit someone else in the rear, how can you even think you have any liability against that party[?']" (Id. at 208:19-22.) Indeed, he explained that "there was a risk we could have lost, for

---

[7] Andrew Finkelstein is the managing partner of the firm that represented Aguilar. He is of no relation to Michael Finkelstein, Aguilar's original trial lawyer. Throughout this decision, Michael Finkelstein will be referred to as "Michael Finkelstein" and Andrew Finkelstein will be referred to by his last name.

sure" (id. at 205:23-206:2, 208:13) and "definitely" a possibility that Aguilar would win nothing at trial (id. at 209:17-19). He further testified that it would have been "reasonable" for someone to conclude that a jury would find against Aguilar and explained that his firm's all-or-nothing approach to the trial—deciding not to acknowledge any liability on the part of Aguilar—was a "calculated risk" equivalent to the "flip of the coin." (Id. at 209:16-210:4.)

Based on the initial information derived from the police report and its initial investigation, (see DX A; DX 18K), Twin City and defense counsel determined that Aguilar, not Sanchez, was at fault for the accident. (Trial Tr. at 235:4-8, 382:3-13; Vitali Dep. Tr. at 41:5-22; PX 10 at '412; Stip. Facts ¶ 14.) As Turney testified, in many of the claims he handles, the insured driver is named as a defendant after rear-ending the plaintiff,

> and in those cases, it is pretty much a certainty that . . . The Hartford's insured will be liable . . . for causing that accident. And here was a case where The Hartford's insured was the lead vehicle, and was hit from behind, and I saw that as a case in which . . . it seemed to me that The Hartford's insured was going to have either no or very minimal liability.

(Trial Tr. at 382:17-383:1.)

Cohen Kuhn's initial assessment of the case in April 2006 was that if Aguilar nonetheless prevailed on most issues, the value of the case was $1 million. (Stip. Facts ¶ 18.) Twin City similarly noted that "[i]f the [plaintiff] prevails, case could be worth 1,000,000." (Id. ¶ 19.) On March 21, 2006, Twin City's claim notes reflect a conversation between Twin City's claims adjuster and an attorney at Jacoby & Meyers, stating that the Jacoby & Meyers attorney advised that "he knows liability is not looking good for his client but he states some[one] pulled over and caused the accident. With the injuries sustained, he had no choice but to file suit." (Stip. Facts ¶ 11.)

Over the course of the litigation, as new information became available, Twin City reevaluated the liability facts (see Trial Tr. at 370:17-22, 383:3-13), but the information consistently indicated that Aguilar had rear-ended Sanchez and "caused the accident" (id. at 400:14-22 ("All of the credible evidence indicated that this was a rear end accident caused by Mr. Aguilar.")).

Aguilar was the first witness deposed. He asserted that Sanchez stopped short, and the rear end of the Sanchez vehicle first swung to the left, and then "swung back to the right and the passenger side rear corner of the [Sanchez truck] struck the front corner of the plaintiff's vehicle." (PX 9 at '370-71.) Turney concluded that Aguilar's testimony was implausible, based on his claims about the vehicle dynamics in the accident. (Trial Tr. at 384:10-20; PX 14 at '1982.) Nonetheless, Turney noted that the photographs of the vehicles could be consistent with Aguilar's version of events, and stated that Twin City needed to consult with someone who could review the photos and interpret the damage and advise Twin City on which version of the accident was more plausible. (PX 14 at '1982.)

At his deposition, Sanchez testified that he was able to stop his vehicle without striking the Shurland vehicle, and that Aguilar rear-ended him. (PX 18B at '350.) Although Sanchez's testimony with respect to distance, time, and speed had issues[8] (see Trial Tr. at 293:6-15), he testified consistently that he was at a stop when Aguilar rear-ended him (id. at 241:1-4).

Shurland's testimony was consistent with that of Sanchez. Shurland testified that he had come to an abrupt stop, and that Sanchez brought his vehicle to a stop behind him without colliding with the Shurland vehicle. (PX 18B at '350.) Thus, as Horan testified, "the truck

---

[8] In 2005, Schweitzer noted after a meeting with Turney and Horan that Sanchez "had problems with speed and distance in his deposition." (PX 7 at '334.) Aguilar's expert had stated in his report that Sanchez's estimates of speed, timing, and distance (e.g., how fast he was going and how far behind Shurland's vehicle he was traveling) were "impossible based upon the laws of physics." (DX XXX at '3411.)

9

behind [] Sanchez should have been able to do the same thing, unless [Aguilar was] inattentive or following too closely." (Trial Tr. at 241:14-21.)

Twin City also retained accident reconstructionist George Ruotolo. (Id. at 385:15-18.) Turney testified at trial that he had worked with Ruotolo in the past and "found him to be the type of expert who if he felt that my position—or the position of The Hartford's insured was unsupportable or was untenable or was not a good position, he would tell me." (Id. at 386:22-25.) Turney discussed the case with Ruotolo and relied on his analysis in evaluating the facts. (Id. at 386:1-3, 387:3-5.) Had Ruotolo concluded that Aguilar's story was supported by the evidence in the case, Twin City would have altered its evaluation of the case and its value. (Id. at 387:16-22.) But Ruotolo confirmed that the collision was a rear-end impact, with Aguilar striking Sanchez in the rear. (See Ruotolo Dep. Tr. at 22:15-23, 24:18-20, 25:23-26:12, 36:24-37:10.[9]) He also determined that Sanchez's truck was a "straight truck," incapable of fishtailing in the manner described by Aguilar. (Ruotolo Dep. Tr. at 29:20-31:2.[10]) He communicated

---

[9] Ohio Casualty objects to much of this portion of Ruotolo's testimony on the grounds that it is improper expert testimony under Federal Rule of Evidence 702, irrelevant under Federal Rule of Evidence 401 (although the objection reads "403 - Relevance," the court presumes that Ohio Casualty meant to cite Rule 401), and inadmissible hearsay under Federal Rule of Evidence 802. (See Ruotolo Dep. Tr. at 22:15-23, 24:18-20, 26:2-12, 36:24-37:10.) Ruotolo's testimony at those points concerns the conclusions he drew as an expert in the Underlying Action, which he communicated to defense counsel and Twin City and to which he testified in the Underlying Action. As such, it is relevant to the question of whether Twin City acted with "gross disregard" in failing to settle the Underlying Action. Moreover, it does not constitute expert testimony under Rule 702. Ruotolo is testifying there about his personal knowledge of statements he previously made and conclusions he communicated in the form of a report and trial testimony in the Underlying Action. These statements are relevant to the instant action to the extent that they factored into strategic choices and settlement decisions in the Underlying Action. Whether or not Ruotolo's opinion about the dynamics of the car accident holds water is beside the point. In other words, Ruotolo does not need scientific, technical, or other specialized knowledge to explain here what he previously concluded and stated in the Underlying Action. For the same reason, this testimony is not hearsay under Rule 802, as it is not being offered for the truth of the matter asserted in the statements. See Fed. R. Evid. 801(c). The objections to these portions of Ruotolo's testimony are overruled.

[10] Ohio Casualty objects to Ruotolo's testimony from 29:24-30:9 on the grounds that it is improper expert testimony under Federal Rule of Evidence 702. In this portion of the testimony, Ruotolo explains that prior to the trial in the Underlying Action, he ran the VIN number of the Sanchez vehicle and determined that it was a "straight truck," not a "tractor-trailer." The court finds that the ability to read a VIN number report or tell the difference between a box or straight truck and a tractor-trailer does not constitute expert testimony because it does not require the application of "scientific, technical, or other specialized knowledge." See Fed. R. Evid. 702(a). The objection is overruled.

these findings to defense counsel, who concluded that Ruotolo's opinion would be helpful at trial. (Id. at 24:10-14, 26:16-18; Trial Tr. 247:7-18, 386:4-9; PX 3 at '196-97, '200; PX 18Q at '1594, '1598; DX DDD at '4746.)

Likewise, Twin City's early impression was that the independent witness, Hohl, would be helpful to the defense because, although his testimony was not precise with respect to the types of vehicles involved, he consistently stated that the Sanchez vehicle came to a stop before being hit by the Aguilar vehicle. In two statements given shortly after the accident, he indicated that the Sanchez vehicle had come to a stop and was then struck from behind by the Aguilar vehicle. (PX 34A at '36; PX 19CC.) He said the same thing in a sworn affirmation that was submitted in support of the motion for summary judgment filed on behalf of Sanchez. (DX KKK.) Twin City thought it important to memorialize Hohl's testimony at a deposition, because he was an out-of-state third party who may not have appeared in person to testify at the trial and because they were concerned his memory could fade. (Trial Tr. at 245:23-246:8; 391:21-392:4; PX 14 at '1998.)

Notwithstanding the fact that Hohl's prior statement "confirmed what Mr. Sanchez said," (Trial Tr. at 244:12-14), Twin City was cognizant of the possibility that Hohl's deposition testimony might not be as strong. (PX 18D at '354 ("If Ricardo Hohl does not make a good witness, this will change our liability position.").) Had he testified in a manner that was unhelpful to the defense, Twin City would have reevaluated its view of liability, and increased the value it placed on the claim. (Trial Tr. at 392:20-393:4, 395:13-25.)

Hohl's testimony had certain inconsistencies with his earlier statements. For example, in his original statement, he said that when the Shurland vehicle stopped, there was screeching and smoke coming from its tires (PX 34A at '36), but during his deposition, he testified that there

was no smoke or screeching (PX 34B at '65). Twin City was also concerned by his statements during the deposition that the Sanchez vehicle was a "tractor-trailer" that "fishtailed" as it moved into the center lane after the Shurland vehicle came to a stop. (Trial Tr. at 256:23-257:3; see also PX 14 at '2027.) However, Twin City was reassured by the fact that, despite the description of a "fishtail," Hohl maintained that Sanchez came to a complete stop before Aguilar rear-ended him. (PX 34B at '57-59, '63-64, '79; PX 13 at '1353.) He also confirmed that both the Sanchez and Aguilar vehicles were in the right lane when Aguilar collided with Sanchez. (Trial Tr. at 257:20-23; DX RRR at '5393.) His testimony was thus consistent with the police report and Twin City's expectations. (Trial Tr. at 258:1-6, 451:23-25 ("he was consistent in the . . . basic mechanics of how the accident happened, that Mr. Sanchez was stopped and that Mr. Aguilar ran into him"); see also Stip. Facts ¶ 10.) It provided no reason to question Twin City's conclusion that Aguilar was at fault for the accident. (See Trial Tr. at 347:11-25, 450:24-451:3, 451:15-19; see also Colavecchio Dep. Tr. at 62:9-16, 63:11-16.)

Defense counsel reported to Twin City that "overall . . . Mr. Hohl's testimony is consistent with the insured's in that the insured was able to stop his vehicle before striking the van in front of his and that he was stopped for some period of time before being struck in the rear." (PX 13 at '1354.) As Turney put it, defense counsel's report of the Hohl deposition "was another confirmation that our understanding of the facts of the accident . . . since we first learned of the accident, were accurate." (Trial Tr. at 394:4-8.)

Defense counsel did have concerns that their client, Sanchez, did not make as strong a witness as Aguilar. (See id. at 291:2-9, 322:5-8.) In particular, his estimates of distance, time, and speed were not accurate. (See id. at 293:6-15.) However, as multiple witnesses explained at trial, it is common for lay witnesses and participants in accidents to get such estimates wrong.

12

(Id. at 293:13-294:9, 343:23-344:6, 402:13-403:3; Ruotolo Dep. Tr. at 40:4-21.) In contrast, according to Horan, Sanchez's statement that his vehicle was stopped when it was hit is "absolutely not" the kind of fact about which witnesses are commonly mistaken. (Trial Tr. at 344:7-10.)

Ultimately, Aguilar was the only witness whose testimony supported his version of the accident (PX 18C at '352 ("Plaintiff is the only person who has a different version of the accident."); see also Trial Tr. at 397:24-398:5), and Twin City concluded that a jury was likely to credit the testimony of Sanchez, Hohl, and Ruotolo over Aguilar. (See PX 3 at '196, '200; Trial Tr. at 397:16-19.) It predicted that there was greater than a 50 percent chance of obtaining a full defense verdict, meaning a zero-dollar verdict. In the event that some liability were apportioned to Sanchez, Twin City expected that the resulting dollar amount would be well within the limit of The Hartford's policy. (Trial Tr. at 398:15-399:9, 399:20-25, 400:11-13, 427:23-428:1, 439:25-440:6; see also Vitali Dep. Tr. at 57:24-58:7, 64:12-20; Colavecchio Dep. Tr. at 60:18-61:1.)

### 2. Twin City's Valuation of the Case

An insurance company's "reserve" is "the money amount that [it] place[s] on a given claim to estimate what [it] will have to pay to settle that claim." (Trial Tr. at 370:24-371:1.) The reserve reflects the overall valuation of the claim or the company's "potential exposure or potential payout of a claim"—it is neither a best-case nor worst-case estimate. (Id. at 82:17-83:8, 371:2-7; cf. id. at 403:5-19 (explaining that the worst-case estimate is known as the "pure exposure value").)

In determining how high to set its reserve in the Aguilar case, Twin City's claim personnel reviewed the known facts about the claim, including the severity of the injuries and the manner in which the accident occurred. (See id. at 372:9-373:19, 374:3-13.) Twin City

recognized that "pure exposure value" of the Aguilar claim was "substantial" based on the "catastrophic" injuries. (Trial Tr. at 403:22-404:3.) However, based on its investigation and review of the facts, Twin City did not believe that it was a case that "would merit an award of [pure exposure value]." (Id. at 404:3-4; see also id. at 441:2-5.) Instead, Twin City concluded that the claim should be reserved at $500,000. (Vitali Dep. Tr. at 25:20-24, 65:13-66:3.) Although Turney had the authority to set a reserve as high as $500,000, the reserve for the Aguilar claim was set following his consultation with his supervisor, who had greater authority, and therefore could have set a higher reserve if warranted. (Trial Tr. at 448:2-6; see also id. at 371:21-372:1.) Twin City's reserve remained at $500,000 until the liability verdict. (Trial Tr. at 406:6-11; Schweitzer Dep. Tr. at 186:17-20, 194:5-10.)

Defense counsel in the Underlying Action, Lewis Johs, likewise—and independently—determined that the total value of the claim was about $500,000. (Trial Tr. at 270:10-18 (explaining that Twin City "never" informed defense counsel of the amount of its reserves).) At trial, Horan confirmed that he believed that a settlement at around $600,000 would have been "too much to pay" on the case, "because the liability situation for us was good." (Trial Tr. at 260:18-22; PX 6 at '331.) Indeed, Horan explained that he put the chances of a full defense verdict (i.e., a zero-dollar verdict) at 50 percent. (Trial Tr. at 267:6-8; PX 3 at '201.) As for the other 50 percent of outcomes, he predicted that Aguilar would be held 90 percent responsible for the accident. (Trial Tr. at 267:20-268:3; see also id. at 269:8-11.) Horan testified that throughout his handling of the case, he never thought that there was exposure to a verdict above $1 million. (Id. at 237:15-18, 269:12-19.)

Horan explained at trial that he provided several pretrial reports to Twin City, based on templates Twin City provided. (Trial Tr. at 264:9, 268:9-10.) These pretrial reports

14

communicated three figures to Twin City: the amount Twin City would pay (1) "[i]f the plaintiff prevails on most or all issues: (full value of case)"; (2) "[i]f defense prevails on most issues: (significant percentage of comparative negligence against the plaintiff)"; and (3) "[i]f an average outcome: (50% comparative negligence against the plaintiff)." (PX 3 at '201.)

At trial, Horan explained that the "full value" of a case as reflected in these reports is the amount that the injuries in a given case are "worth," assuming that everything goes in the plaintiff's favor. (Trial Tr. at 265:6-8.) This figure is also equivalent to the "sustainable" verdict amount—i.e., an amount that the Appellate Division would be likely to uphold on appeal, based on rulings in similar cases. (Trial Tr. at 265:9-18, 266:16-24.) With respect to the Aguilar case, defense counsel put the "full" value of the case at $5 million in these pretrial reports. (PX 3 at '201; Trial Tr. at 265:3-8.) Twin City agreed with this assessment. (Trial Tr. at 406:25-407:2, 466:19, 467:2-4; see also Vitali Dep. Tr. at 58:14-59:4.)

With respect to the second category, "[i]f defense prevails on most issues: (significant percentage of comparative negligence against the plaintiff)," defense counsel wrote "under $500,000." (PX 3 at '201.)

Horan testified that the third category, "average outcome," is not a term of art in the personal injury world and is instead an "ambiguous term" that he doesn't use in his practice. (Trial Tr. at 268:9-17.) In the reports, he answered this question by providing Twin City with the amount that they would have to pay if a jury found that Aguilar was 50 percent at fault for the accident. (Id. at 268:15-17; PX 3 at '201 ("(50% comparative negligence against the plaintiff)").) Based on a "full value" of $5 million, that amount would be $2.5 million. (Id.) Horan clarified at trial that he never discussed this figure with Twin City and that he was not communicating any belief that the case would resolve for $2.5 million or that Aguilar would only

be held 50 percent liable for the accident. (Trial Tr. at 268:12-13, 20-21, 269:2-11.) Twin City similarly did not interpret the defense reports to be communicating any expectation that the case would resolve for $2.5 million or that Aguilar would be found 50 percent responsible. (Id. at 399:10-19 (Turney explaining that he understood the "average outcome" calculation is "just a calculation that John [Horan] was providing"), 407:24-408:3 (Turney stating that $2.5 million was "simply an arithmetic calculation" and that he never understood the $2.5 million figure to be suggesting that the overall evaluation of the case was $2.5 million).)

Notably, although Aguilar's injuries were significant, the jury would not have been aware of them when deciding the liability question, because Kings County, where the case was pending, has bifurcated trials. (Id. at 130:24-132:6, 348:9-25.) In fact, when the Underlying Action went to trial, the trial judge ordered Aguilar to wear and conceal his prosthetic leg, so that the jury would not see that he was an amputee. (Id. at 132:19-133:8.) Counsel for both sides testified that, while Kings County juries are pro-plaintiff with respect to damages, they are about neutral on the question of liability. (Id. at 169:16-170:2; see also Vitali Dep. Tr. at 33:8-34:2; Colavecchio Dep. Tr. at 47:3-17.)

Aguilar's attorneys, Jacoby & Meyers, retained numerous damages experts, who were prepared to testify that Aguilar's special damages alone were in the multiple millions of dollars. (PX 3 at '198-99.)[11] In the post-verdict settlement demand, Aguilar's counsel also cited several purportedly similar cases with verdicts ranging from $10 million to $19 million. (PX 32A.) But defense counsel's research of sustainable verdicts revealed a value closer to $5 million (DX

---

[11] Ohio Casualty has suggested that the $5 million "full" value was low, because it did not increase from report-to-report when, later in the life of the case, Aguilar disclosed experts that would increase his claimed special damages. (See Trial Tr. at 323:5-324:2.) But as Horan explained, based on the bill of particulars, it was a given that Aguilar would eventually disclose damages experts, and an estimate of these claims was factored into the "full" value from the start. (Id. at 266:6-15, 324:20-325:15.) In other words, Horan utilized his considerable experience to evaluate the "full" value of the case from the outset.

MM), and Twin City had retained multiple damages experts to support the defense (PX 3 at '199-200; Trial Tr. at 493:23-494:4). Rather than accepting the plaintiff's experts' numbers for the purposes of valuing the case, therefore, Turney "focused on what I thought a jury might do with this case based on all the facts of the accident, including the liability facts and the damages facts." (Trial Tr. at 463:24-464:1.) He explained that in his experience, he "ha[s] found expert analyses that are projecting future expenses and medical costs . . . to be wildly exaggerated sometimes." (Id. at 464:2-4.) So, while he "understood that [the high figure cited by experts] might be a number that would eventually get in front of a jury . . . . [he] also kn[e]w that that expert would be subject to cross-examination and that those numbers might be—might well be put into serious doubt." (Id. at 464:5-9.) Indeed, he explained to Ohio Casualty's Adam Woellert before the trial that although he expected the jury to "be sympathetic and . . . accept [Aguilar's] claim that he is unable to work for the rest of his life at face value" (PX 1B at '256), he also expected the jury to "challenge the amount and most likely not agree with the $3.4M figure" (id.).

     3.     Ohio Casualty's Pre-Trial Assessment of the Underlying Action

On February 6, 2006, Ohio Casualty was notified of the Underlying Action. Ohio Casualty "elected not to open [a claim] file at that time." (Stip. Facts ¶ 16; Trial Tr. at 65:24-66:4.) On July 25, 2006, Twin City followed up with Ohio Casualty, providing the bill of particulars and advising that it was likely to increase its reserve. Notwithstanding this information, Ohio Casualty chose to maintain its file as "record only." (PX 14 at '1906.) As Turney explained, when an excess carrier decides to enter a claim as "record only," "it means that they are acknowledging that they have . . . been advised of the existence of the claim and . . . they are not going to be following it actively." (Trial Tr. at 434:3-13.) When trial was

approaching, Twin City re-notified Ohio Casualty. (PX 14 at '2056.) At that point, Ohio Casualty took an active involvement in the claim.

Ohio Casualty did not dispute Twin City's assessment of the claim. After speaking with Turney in February 2013, Woellert noted that "given the liability issues, this will not impact our layer." (PX 1B at '257.) He wrote in internal reports that liability was "highly questionable" and "remote." (Trial Tr. at 84:19-22, 88:14-18; PX 1B at '257; DX AA at '81.)

In March 2013, Ohio Casualty sent a letter to Twin City demanding that Twin City settle the Aguilar claim within the Twin City policy limits. (PX 1H.) The letter, referred to at various times as the "hammer letter" (see PX 15 at '3098), stated that Twin City "currently has the ability to resolve this matter within its limits and prevent any excess exposure." (PX 1H at '97.) Turney testified at trial that this letter was based on Ohio's Casualty's mistaken understanding that there had been a $1 million settlement demand, which would have been within Twin City's layer, when in fact there was no such demand. (Trial Tr. at 436:1-6.) He also testified that Ohio Casualty made no further attempts to urge it to settle the claim with Aguilar. (Id. at 436:7-11.)

Ohio Casualty did not set a reserve on the claim upon receiving notice of it, upon receiving defense counsel's reports, following discussions with Twin City, or at any other time before the liability verdict. (See id. at 82:14-16, 83:9-15, 101:7-9, 102:4-10.) Specifically, Ohio Casualty did not post a reserve as a result of any of the following events:

- Turney sent Woellert Lewis Johs's August 2012 report on February 12, 2013. (PX 1E at '10.) That iteration of the report, like the other two, listed the "full" value of the claim as $5 million and the "average" outcome as $2.5 million. (PX 5 at '300.) It listed Aguilar's claimed lost wages as totaling $3.4 million. (Id. at '296.)

- On February 26, 2013, Turney sent Woellert the most recent Lewis Johs report. (DX Z.) This report included a description of the expert testimony regarding Aguilar's damages, which exceeded $1 million.

- Woellert testified that he spoke with Turney that same day, and he made a lengthy note of that conversation. (See Trial Tr. at 33:23-35:25; PX 1B at '256-57.) Nowhere in that

note is there any indication that the conversation with Turney suggested to Woellert that the claim was likely to reach the Ohio Casualty layer.

- Woellert testified that on March 7, 2013, Ohio Casualty conducted an internal roundtable during which it was discussed that "possibly the $5 million wasn't a realistic worst case for a Brooklyn jury" and that it was realistic to expect the case to resolve for something between "$2.5 million to something north of 5 million." (Trial Tr. at 81:20-23, 82:8-10.) Nonetheless, this conclusion was not documented in Woellert's claim notes and "[i]t was agreed to keep monitoring reserve," i.e., not to set any reserve. (PX 1B at '256.)

After the jury returned a liability verdict, and after Ohio Casualty agreed to settle the claim, it posted a reserve for the first time. (See Trial Tr. at 101:22-102:10.)

### E. Settlement Discussions

The dichotomy between the value of Aguilar's injuries and the rear-end nature of the accident made it a difficult case to settle. (Id. at 349:11-17, 376:9-16, 408:12-22.) Indeed, Aguilar's attorney, Scanlan, testified that it is "almost impossible to settle a case like that," and that had she been representing the defendant, she would "never pay on a case like that." (Id. at 130:15-17; see also id. at 130:20-23.)

Finkelstein explained how his firm values cases. He testified that, in a case involving catastrophic injuries, the available insurance limit plays a central role in the valuation of the claim—"if the injury far exceeds the amount of insurance coverage," then the claim is valued at the insurance limit. Thus, early in the life of the Aguilar claim, Finkelstein set its value at $1 million, which was the extent of the insurance of which he was aware. (Id. at 199:12-200:2.) Attorneys at his firm, like Scanlan, have "full authority to resolve" a case for an amount above the internal valuation without involving Finkelstein, but the firm's policy is not to recommend settlements below that amount to its clients. (Id. at 200:10-21; see also id. at 146:3-7; M. Finkelstein Dep. Tr. at 36:22-37:4.)

Finkelstein also explained that for every case in which the value of the injury is in excess of the policy limit, the firm must obtain an affidavit of no additional insurance before entering a

19

settlement. (Trial Tr. at 204:10-15; see also M. Finkelstein Dep. Tr. at 32:14-34:4; DX P.) Thus, had there been an offer to settle the Aguilar claim at $1 million—which there was not (Trial Tr. at 212:18-22)—the settlement could not be effected without such an affidavit.

Finkelstein testified that he never believed that Sanchez's employer, the operator of a commercial trucking fleet, had only $1 million in available insurance. (Id. at 204:16-205:3, 213:11-21.) However, he was not actually aware of the $4 million excess policy issued by Ohio Casualty until shortly before the April 2013 trial. (See DX AAAA; Trial Tr. at 202:13-15.) When Aguilar's counsel became aware of the full extent of the insurance available, the internal valuation of the claim was "materially increased . . . to at least $2 million." (Trial Tr. at 202:16-23.) At that point, Finkelstein testified, an offer of $2 million would be one that he would have discussed with Aguilar—it would not have been one that he would have rejected outright or strongly recommended. (Id. at 203:4-24.) He explained that the value of Aguilar's injuries was greater than $5 million, but that, in light of the liability facts, the valuation of the claim was not set at the insurance limit. (Id. at 205:23-206:6 ("If it didn't happen the way that the police report outlines, it would have been 5 million.").)

Finkelstein testified he would "definitely not" have recommended that Aguilar accept a $1 million offer if he were aware of the $4 million excess policy. (Id. at 205:4-11.)

> Q    So even if there had been a million dollar offer or a million dollar demand, once you learned of that 4 million in excess coverage, a million dollar settlement would have been off the table, correct?
>
> A    Correct.

(Id. at 214:15-19.)

1.    Settlement Demands, Offers, and Overtures

During the course of the trial, the witnesses testified at length about how settlement negotiations in personal injury cases are typically conducted. The witnesses were consistent in testifying that in the industry, the onus is on the plaintiff, not the insurer, to begin settlement negotiations. Counsel for plaintiffs and defendants frequently discuss settlement in broad terms. The witnesses described this process as "floating numbers" or making settlement "overtures." They were consistent in their explanation that only an actual demand or offer can lead to a settlement.

Turney testified that "in practice, it is the plaintiff that will make the first demand." (Id. at 376:23.) In the course of his career as a defense attorney, working with multiple insurance carriers, it was his experience that the onus is on the plaintiff to make a demand before settlement negotiations can get underway. (Id. at 377:16-20, 409:9-18, 438:3-6.) Making a settlement offer without a demand on the table is "not the way it is normally done." (Id. at 437:21-24.)

John Horan, who has been representing defendants for 26 years (id. at 233:14-17), explained that:

> A settlement demand is a specific number . . . . And normally those are numbers that are negotiated against. And plaintiffs attorneys know that so they never give you the bottom line as the settlement demand.
>
> And I would call an overture something, ["]hey, listen, we're interested in settling the case. Let's see if we can do something.["] . . . ["]If you get me this amount my client will take it,["] then it's an overture. And overtures don't go anywhere until there is a commitment by the plaintiff.

(Id. at 249:23-250:9.) Put another way,

> Q    If you go to shake his hand and he says, ["]wait a minute, there is other stuff we need to do.["] Is that a settlement demand?

21

> A    No. Then he says [“]I have to check with my client, I have
> to check with the liens.[”] In other words, he can't specifically settle
> it for that amount at that time.

(Id. at 250:15-20.) Horan explained that he has not settled cases without a plaintiff's demand:

> Q    Were you ever offered to settle a case, offered an amount
> without a settlement demand.
>
> A    Absolutely not.

(Id. at 326:24-327:1; see also id. at 325:21-326:10.)

Scanlan, who has practiced personal injury law for 32 years (id. at 124:21-24), also

repeatedly testified that "floating" numbers is not the equivalent of making demands (id. at

145:18-22, 150:24-151:7). She explained that in her view, a "firm offer" "would have to be an

attorney saying they have this authority and they do so in front of a judge. Other than that, I

really don't consider it a firm offer . . . if it's a verbal because people say they didn't say things

and things like that." (Id. at 152:17-21.)

Michael Finkelstein, who has practiced personal injury law for 34 years (M. Finkelstein

Dep. Tr. at 37:25-38:3), testified in the same vein:

> Q    Are you saying as you sit here today that there were never
> any conversations between yourself and Mr. Horan?
>
> A    No, I am not saying that at all. I'm saying that there was
> never any formal settlement demand, whether in writing or orally.
> You know, we had settlement discussion, overtures, to see where the
> carrier was coming from.

(Id. at 47:7-14.)

### a.    A "Six-Figure" Settlement Proposal in 2010-11

On September 16, 2010, Michael Finkelstein contacted John Horan to discuss the

possibility of settlement, noting that his client was experiencing financial difficulties. (PX 14 at

'2013.) Horan reported the conversation to Twin City, and Twin City instructed Horan to "call

plaintiff attorney and get a demand figure from him . . . . If the figure is reasonable, we will all discuss the claim again." (Id.; see also Trial Tr. at 483:20-22.)

On September 24, Horan reported that he would "follow with Mike Finkelstein about a demand and let you know." (PX 14 at '2014.) On October 7, Horan still had not "hear[d] back from plaintiff's counsel regarding a firm settlement demand." (DX H.)

As Horan explained at trial, Finkelstein "never gave me a specific settlement demand. He was vague about how much it would take." (Trial Tr. at 249:15-16.) In the course of their conversations, they discussed the existence of a lien held by the workers compensation insurer, agreeing that "that's going to be, maybe if it's big, an obstacle to settling the case." (Id. at 249:17-19.)

Meanwhile, Twin City was attempting to negotiate with the workers compensation insurer, and to obtain Hohl's deposition testimony. (Id. at 254:15-255:6.) Getting the cooperation of the workers compensation insurer was necessary to effect a settlement that reflected Twin City's valuation of the claim. (See id. at 413:11-15, 414:11-20.) Memorializing Hohl's testimony, and further bolstering the defense liability case, was seen as valuable in bringing the plaintiff to the table at a reasonable amount. (Id. at 411:18-22.)

By February 2011, Hohl's deposition had been taken, but the workers compensation carrier refused to compromise its lien. (See DX QQQ.) Despite having multiple conversations with Horan about a potential settlement, Finkelstein never made any demand during that time period, or even suggested any actual numbers. (Trial Tr. at 328:6-17, 330:8-16, 411:3-5, 419:3-11.) Accordingly, Horan was not authorized to make any settlement offers. (Id. at 331:18-20, 332:25-333:5.)

Michael Finkelstein confirmed that he never made any settlement demand, and was never authorized to do so. (M. Finkelstein Dep. Tr. at 40:3-6, 41:24-42:5.) As Turney explained,

> this was not the first rodeo for either Attorney Finkelstein or us. And the way it works is that plaintiff makes a demand, and we had asked him for a demand, and for some reason, I don't know why, no demand was made in response to our request. Even though his client was apparently . . . looking for a settlement, he wouldn't tell us what he was looking for.

(Trial Tr. at 482:19-25.)

### b. Putting $250,000 in Aguilar's "Pocket" in 2012

At a pretrial conference in May 2012, Scanlan evidently suggested the possibility of a settlement at an amount that would net $250,000 to Aguilar. (DX R.) She did not actually make a demand (Trial Tr. at 262:16-18; see also id. at 264:16-18), but this was the first time that any attorney representing Aguilar had suggested any actual dollar amount that might lead to settlement (id. at 421:1-4).

Turney concluded that a settlement large enough to cover the lien, an attorney fee, and net $250,000 to Aguilar would mean a payout of about $1 million. (DX DDD at '4749; Trial Tr. at 422:9-15.) There was never any actual demand made for $1 million. (Trial Tr. at 422:16-423:1.) Indeed, Scanlan testified that, even if defense counsel had responded by offering a settlement that would have put $250,000 in Aguilar's "pocket," the case would not have settled—"it would be impossible." (Id. at 147:25-148:8.) Horan concurred, explaining that the workers compensation carrier would not have been willing to accept the reduction necessary to effect a settlement like that. (Id. at 263:3-13.)

### c. An $850,000 Settlement Proposal in 2013

In March 2013, Scanlan contacted Horan and told him that if the defense "could get $850,000 she thought they could settle the case." (Id. at 271:12-14.) Scanlan explained that she

24

did not make any actual settlement demand for $850,000, but that she may have "floated" a number. (Id. at 183:15-23; see also id. at 350:2-7.) Nonetheless, she explained that she "basically wanted to just see if there's any chance we could settle it . . . knowing full well it's not going to settle because my client wouldn't take that anyway." (Id. at 150:24-151:10.) She further explained that the case would "[a]bsolutely not" have settled if Twin City had tendered an offer of $850,000. (Id. at 151:15-18; see also id. at 275:8-13.)

Twin City decided to offer $150,000 in response to Scanlan's overture, signaling a potential settlement at the midpoint between that number and $850,000, i.e., $500,000. (Id. at 426:14-23; see also id. at 273:7-14; Vitali Dep. Tr. at 79:6-13.) That amount was precisely what Twin City had reserved the case at, and what defense counsel predicted for a value if there was not a complete defense verdict. (Trial Tr. at 273:15-17.) Twin City's $150,000 offer was never intended to be a final offer. (Id. at 351:3-6, 426:24-427:3.)

Horan testified that when he attempted to inform Scanlan of the $150,000 offer, she said to "forget it, the 850 is off the table." (Id. at 271:17-19.) He explained that Scanlan "shut down at 850 as if she had misspoken," saying, "[·]don't go to The Hartford for any money, the 850 is off the table.[·]" (Id. at 272:23-25; see also id. at 273:18-20, 342:8-14, 350:15-22, 474:17-475:10, 476:8-13.) Scanlan testified that she rejected the offer "before it was even like as soon as he said it." (Id. at 155:22-156:1.) She testified that neither the amount nor the timing of the $150,000 offer—right before trial—had a negative impact on settlement discussions. (Id. at 158:20-159:4.)

2.    Obstacles to Settlement

The evidence adduced at trial showed that the workers compensation lien was an impediment to settlement. By late 2010, the lien was already above $400,000 (DX MMM), and

it eventually reached approximately $450,000 (PX 3 at '198). Under New York law, the workers compensation carrier is entitled to recover the amount of its lien, less a statutory reduction, before the plaintiff receives any of the settlement funds. (See Trial Tr. at 144:21-25, 226:12-15, 250:21-251:2.) Thus, any potential settlement would have had to be substantial enough to cover the workers compensation lien. (Id. at 413:11-15.)

In some cases, workers compensation carriers are willing to negotiate an additional discount off their liens. (Id. at 47:4-10.) Unless the workers compensation carrier agrees to reduce its lien voluntarily, however, the defendant (or its liability insurer) still has to pay the full amount. (Id. at 424:25-425:5 (Turney explaining that the statutory discount did not reduce the amount the defendant has to pay).) Voluntary discounts are typically negotiated between plaintiff's counsel and the workers compensation insurer, rather than between defense counsel and the insurer. (Schweitzer Dep. Tr. at 152:1-6; Trial Tr. at 313:7-11 ("Then the plaintiff goes and does that with the Worker's Comp carrier."); id. at 250:24-251:1 ("So any number that we talked about settling with Mr. Finkelstein, he would have to go back and pay them back.").) Nonetheless, Twin City made repeated efforts to bring the workers compensation insurer, PMA, to the table to negotiate a voluntary settlement of its lien. (Trial Tr. at 247:25-248:6.) For example:

- In October 2010, at a roundtable meeting, it was decided that "defense counsel will follow up with workers compensation carrier and determine how flexible they will be on settlement of the lien based on the liability position." (PX 18E at '357.) Horan spoke to a representative of PMA, who told him that the company "usually do[es] not negotiate the lien." (PX 14 at '2020.)

- Horan then wrote to PMA's Tammy Falconer, providing a brief synopsis of the case and asking "what, if any, percentage" of the lien that PMA would accept. (DX NNN at '5041.) Upon receiving the letter, Falconer wrote in her claim notes that "there is absolutely no benefit for us to" accept less than the full amount of the lien. (PX 20 at 48-49.) She wrote back to Horan: "we are not willing to

waive our lien or in any way reduce the lien in this case." (DX OOO.) Horan reported this to Twin City on November 9, 2010. (PX 14 at '2023.)

- In January 2011, Falconer's supervisor wrote that she "agree[d that there is] no benefit to waiving our lien." (PX 20 at 46.) Shortly thereafter, Horan wrote to Twin City, reporting that he appeared at a pretrial conference on January 31, at which "time all counsel informed the court that the plaintiff's attorney was attempting to contact the Workers' Compensation carrier in an effort to have them reduce the substantial Workers' Compensation lien." (DX QQQ.)

- In April 2012, prior to the May pretrial conference, Twin City held a roundtable conference. At the conference, it was noted that defense counsel had already sent two letters to PMA, which was unwilling to reduce its lien. (PX 6 at '331.) At the roundtable, it was suggested that defense counsel request that the judge order PMA to attend the upcoming conference. (PX 6 at '332; see also Trial Tr. at 420:2-8.) Horan wrote to Falconer, and requested that PMA attend the May conference. (DX TTT.) But the attorney who attended the May conference on PMA's behalf "indicated that she had no authority to compromise the lien at all." (DX R.)

- PMA sent an attorney to a pretrial conference on January 25, 2013. She "indicated that PMA Insurance was not interested in compromising their $445,000.00 lien further than the one-third mandatory deduction. Accordingly, settlement discussions ended there." (DX U at '8979.)

- On February 1, 2013, Turney noted that he "had a conversation with DC Horan on past mediation efforts. While we have not had a formal mediation with an outside mediator, the judges who have looked at this case have found that the impediment to a reasonable settlement is the WC carrier. The lien is $450K and they are insisting on recovering their full $300K." (PX 14 at '2056.)

As Scanlan and Michael Finkelstein testified, no settlement was possible without PMA's cooperation. (Trial Tr. at 153:23-154:4; M. Finkelstein Dep. Tr. at 42:14-17.) "In New York, as I am sure you are aware, if you are going to settle a case, you need to get consent from the workers' compensation carrier in writing, which lays out what their agreement is in terms of whether they are waiving the lien, reducing it to a concern [sic] percentage." (M. Finkelstein Dep. Tr. at 47:15-21.) Andrew Finkelstein, who has practiced personal injury law for 28 years, (Trial Tr. at 197:21-198:1), concurred:

> Q      You don't need a carrier's permission to settle a case, do you?

A     Yes, you do.

Q     You do?

A     Yes.

Q     The carrier needs to consent to a settlement?

A     They have to consent [to] either waive their worker's compensation lien or work it out, otherwise we are burning their subrogation rights and we'd have liability if we do that. So it is always subject to worker's comp, consent, and waiver.

(Id. at 225:11-21; see also DX MMM (reporting on the amount of the lien and stating that the letter does not serve as a "consent to settle").)[12]

Another obstacle to settlement was the need for Aguilar's attorneys to be certain that they were aware of all available insurance before agreeing to any settlement amount. (Id. at 138:14-139:16; M. Finkelstein Dep. Tr. at 42:10-13.) Thus, none of the purported settlement opportunities could have actually been consummated absent confirmation that there was no excess insurance. (See Trial Tr. at 148:21-24.) The Jacoby & Meyers attorneys never received such confirmation, and indeed, it was not possible, because there was excess insurance—although the plaintiff's attorneys were unaware of it at the time of the purported settlement demands. (Id. at 259:2-9, 262:19-263:2, 275:14-17.)

Of course, Aguilar himself was the person who ultimately would decide whether to settle the case (id. at 220:3-4, 231:4-6), and he was unwilling to settle (id. at 231:7-10.) Aguilar was insistent that the case be taken to trial:

He was angry, and he wanted to communicate his anger to a jury, because he believed the jury would believe him. . . . He wanted to communicate the violation that he felt and truly believed in his core that he did not contribute to this, and he could not live with the fact that he did something to himself that took his leg off. . . .

---

[12] Ultimately, after Ohio Casualty settled the case after the liability verdict, PMA did in fact recover its entire lien, as reduced by statutory mandates. (Id. at 166:16-21, 167:4-8; see also id. at 47:11-15).

> He was committed to the fact that "I didn't do this to myself, and people need to believe that."

(Id. at 231:14-232:2.) That effectively precluded any meaningful settlement discussions between his attorneys and defense counsel. (See id. at 145:20-22.) Scanlan never had authorization to settle the case before the liability verdict. (Id. at 161:2-4.) Finkelstein likewise confirmed that the case could not have settled.

> Q      At any time before that liability verdict, was there ever an opportunity to settle the Aguilar case for a payment of a million dollars or less?
>
> A      No.

(Id. at 212:18-22.)

Scanlan further testified that nothing about "the manner in which [Twin City] approached the case somehow frustrated the settlement possibilities." (Id. at 161:5-9, 162:10-12.)

- "I honestly thought—I thought $150,000 offer for a rear-end collision on my guy was actually a pretty generous offer on their part but it wouldn't have settled it with Mr. Aguilar." (Id. at 187:5-8.)

- "[I]f I were the defendant I wouldn't have even offered the 150. My guy rear ended the truck in front of him." (Id. at 188:11-13.)

**F.      The Trial and the Surprise Verdict**

The trial of the Underlying Action appeared to go smoothly from the defense perspective, with all of the evidence going in as expected. (See id. at 429:21-430:2.)

Mike Colavecchio is the Lewis Johs attorney who tried the case. (Id. at 43:8-10.) Colavecchio has decades of experience trying personal injury cases in New York, and has taken 100 cases to verdict. (Colavecchio Dep. Tr. at 5:19-20, 7:4-14, 97:23-98:5.) Other than the Underlying Action, he believes that he has never failed to obtain a defense verdict in Kings County. (Id. at 98:6-13.)

Colavecchio reported that Sanchez "did fairly well on his testimony, and the problems with distance and speed that he exhibited at his deposition did not seem nearly as bad at trial." (DX FF at '3162; see also Colavecchio Dep. Tr. at 103:2-6.)

The co-defendant, Shurland, confirmed that the Sanchez truck "was a box truck, not a tractor trailer," which contradicted the plaintiff's "fishtailing" theory. (DX FF at '3162.)

Aguilar testified that the Sanchez truck fishtailed and struck his vehicle on the side. (Id. at '3160.) But his testimony exhibited many of the distance-, speed-, and time-estimation problems that are common for lay witnesses. (Id. at '3160-61.) Colavecchio concluded that Aguilar's "testimony made no sense, and I suspect that the jury understood that." (Id. at '3161.)

Scanlan had Hohl's deposition transcript read to the jury. Colavecchio reported that "[t]he entire transcript was read, 805 of which helps us." [13] (Id. at '3161.) Critically, Colavecchio noted that Hohl "testified that we were stopped for 3 to 4 seconds before plaintiff truck struck us, and I will highlight that testimony in my closing." (Id.) Colavecchio believed that Scanlan wanted to use the deposition to introduce Hohl's earlier, handwritten statement, which contained certain inconsistencies, such as whether he saw smoke coming from Sanchez's tires (PX 34A), but Colavecchio successfully objected to its presentation to the jury. (Id.; see PX 34B at '65-66 (describing the handwritten statement).)

At trial, Scanlan did not call the accident reconstructionist that she had retained. She explained that she reached this decision:

> Because he didn't help me. And honestly, if your own expert
> blames the accident mostly, or at least a big part, on your own
> client, it would be, I think malpractice on my part to call this
> expert.

---

[13] "805" appears to be a typographical error, and Colavecchio intended to write either 80% or 85%. (See Stip. Facts ¶ 80.)

(Trial Tr. at 136:23-137:1; see also Vitali Dep. Tr. at 45:8-20 ("There would be no other reason why you couldn't bring your expert in when you hit a stopped vehicle in the rear. You need all the help you can get at that point.").) Colavecchio likewise concluded that the expert "probably told her that his testimony would hurt her." (DX FF at '3161.)

The police officer who responded to the accident testified "that his observation of the vehicles in the accident showed that the majority of damage to the plaintiff's vehicle was in the front, and that there was no damage to the passenger side of the Sanchez truck." (Id. at '3159.) Accordingly, his testimony supported "the position of Sanchez and non-party Hohl that this was a rear end collision." (Id.)

Finally, Ruotolo "testified quite well." (Id. at '3159.) He not only explained that the damage was consistent with a rear-end collision, but explained that, even if the Sanchez truck had fishtailed, its lateral speed would only have been 1.2 miles per hour, i.e., far too slow to cause the kind of damage sustained by the Aguilar truck. (Id.; see also PX 15 at '3099; M. Colavecchio Dep. Tr. at 101:2-21.)

The jury nonetheless returned a verdict finding Sanchez 100 percent liable for the accident. (Stip. Facts ¶ 82.) This verdict was a surprise to all involved.

Turney testified that he "had never been more surprised at the outcome of a trial." (Trial Tr. at 430:23; see also Vitali Dep. Tr. at 64:24-65:9.) Based on the progress of the trial, he had not seen any reason for concern: "Never. Not once. Not a bit." (Trial Tr. at 430:17-20.)

Horan was "very surprised" by the verdict. (Id. at 275:18-20.) He explained that, as a defense attorney, he frequently represents the driver of the following vehicle in rear-end accident cases. (Id. at 276:4-9.) Those cases do not typically go to trial, because "we write them up as

100 percent liability against our client." (Id. at 276:10-15.) The anomalous verdict in this case has not changed the way that he views rear-end accident cases. (Id.)

Colavecchio testified that he was surprised by the verdict, and that "everybody was surprised," including Ohio Casualty. (Colavecchio Dep. Tr. at 99:21-100:4.) He explained that "[a]t no point until the moment the jury returned its verdict, did [he] feel bad about the case." (Id. at 101:21-23; see also id. at 105:10-18.)

When the verdict came in, Colavecchio reported to Twin City and Ohio Casualty that "I don't understand the verdict and believe it to be against the weight of the evidence. Frankly, I am shocked. I have never seen a more surprising verdict." (DX GG at '2984.) He followed that up with an email to his partners, writing "I am scratching my head" and "I just do not understand it." (PX 34G at '2975.) His partner, Fred Johs, responded by saying that the verdict was "insane" (id.) and that "[y]ou just can't explain it" (PX 34F at '2971).

Ruotolo testified that he was "at least surprised, perhaps stunned" by the verdict. (Ruotolo Dep. Tr. at 45:13-17.) In his decades of experience as a police officer and accident reconstructionist, he has never seen another case in which a jury has assigned zero fault to the following driver in a rear-end collision. (Id. at 46:15-47:2.)

Even Scanlan was surprised, "very much so," because "we really didn't have a lot of proof as to [Aguilar's] version." (Trial Tr. at 160:21-161:1.)

Ohio Casualty was likewise surprised. Woellert testified that the only surprise at the trial was the verdict. (Id. at 88:8-10, 91:11-12.) He wrote that it was "inexplicable" that the jury did not place any liability with Aguilar:

> The jury simply did not believe the police officer, independent
> witness, our accident recon[structionist] or even the other driver as
> to how the accident occurred. They even ignored the scene photo

> which showed only a 4 ft wide shoulder but [plaintiff's] 8 foot
> wide truck.

(PX 1B at '253.) In fact, prior to the verdict, Ohio Casualty had not established a case reserve and

had not even put its reinsurers on notice of the possibility of a loss within its layer. (Stip. Facts

¶ 83; Trial Tr. at 95:6-8.)

### G.    Settlement Following the Liability Verdict

On April 17, 2013, after the jury returned its liability verdict, Finkelstein wrote to

Colavecchio, demanding that the insurers tender the full $5 million to settle the case, and setting

a deadline of April 19, 2013. (PX 32A.) This was the only settlement demand made in the

course of the Underlying Action. (Trial Tr. at 207:11-13; see also id. at 91:22-92:2.)

Finkelstein's letter also asserted that a failure to pay the $5 million limits, thereby

potentially exposing Sanchez to personal liability, would constitute bad faith on the part of the

insurers. (PX 32A.) Finkelstein testified that he has been involved in bad faith litigation with

insurers in other cases, but that he never considered Twin City's handling of the defense of the

Underlying Action to have been in bad faith. (Trial Tr. at 211:11-18.) As he explained:

> the only basis to not offer their full policy was the liability
> question, which there was a significant question, but once that was
> resolved at a hundred percent, . . . and all that's left is the value of
> the claim . . . it was clearly worth well in excess of [the policy
> limits], and once that determination was made . . . the full policy
> should be offered.

(Id. at 211:14-212:1; see also M. Finkelstein Dep. Tr. at 41:10-23.) As Scanlan testified,

however, Ohio Casualty did not immediately tender its full limit, causing her to try much of the

damages case, before ultimately settling for the full amount. (See Trial Tr. at 188:15-22; Stip.

Facts ¶ 93.)

Upon receiving a copy of Finkelstein's demand letter, Sanchez (through the lawyer

representing him as a plaintiff in his own case against Aguilar) demanded that the case be settled,

to avoid exposing him to personal liability. (Trial Tr. at 92:19-21; M. Colavecchio Dep. Tr. at 93:11-15, 94:3-18; PX 14 at '2059.) Neither Sanchez nor anyone representing him had made such a demand to Twin City before the liability verdict. (Trial Tr. at 436:23-437:1; M. Colavecchio Dep. Tr. at 93:6-10.)

On April 19, 2013, Twin City made its policy limit available to Ohio Casualty to use in negotiation with the plaintiff. (DX OO; Trial Tr. at 432:5-9.) Ohio Casualty accepted the tender. (Stip. Facts ¶ 90.) At this point, Ohio Casualty assumed control of the defense and made the decision to settle the claim, rather than appealing the jury verdict on liability. (Id. ¶¶ 93-94.)

## II.   CONCLUSIONS OF LAW

### A.   Legal Standard

Ohio Casualty claims that Twin City breached its duty of good faith and fair dealing by failing to settle the Underlying Action within the liability limits of the primary policy issued by Twin City. "The notion that an insurer may be held liable for the breach of its duty of 'good faith' in defending and settling claims over which it exercises exclusive control on behalf of its insured is an enduring principle, well settled in [New York's] jurisprudence." Pavia v. State Farm Mut. Auto. Ins. Co., 626 N.E.2d 24, 26 (N.Y. 1993) (citations omitted). "The duty of good faith reflects the inherent conflict between the primary insurer's desire to settle the claim for as little as possible and the excess insurer's desire to avoid a judgment exceeding the primary policy limit." New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 295 F.3d 232, 241 (2d Cir. 2002) (citing Smith v. Gen. Accident Ins. Co., 697 N.E.2d 168 (1998)).

"New York courts have acknowledged the existence of a strong presumption against bad faith on the part of a primary insurer." Quincy Mut. Fire Ins. Co. v. New York Cent. Mut. Fire Ins. Co., 89 F. Supp. 3d 291, 306 (N.D.N.Y. 2014) (citing Hugo Boss Fashions, Inc. v. Fed. Ins.

Co., 252 F.3d 608, 624 (2d Cir. 2001)). "Bad faith may only be found where the insurer acts in gross disregard of the excess carrier's interests, not where the insurer is merely negligent." New England Ins. Co., 295 F.3d at 241. "[T]o establish a prima facie case of bad faith, the plaintiff must establish that the insurer's conduct constituted a 'gross disregard' of the insured's [or excess insurer's] interests—that is, a deliberate or reckless failure to place on equal footing the interests of its insured [or excess insurer] with its own interests . . . ." Pavia, 626 N.E.2d at 27 (citation omitted). "Gross disregard means a pattern of behavior evincing a conscious or knowing indifference to the probability that an insured [or excess insurer] would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted," New Engl. Ins. Co., 295 F.3d at 241 (emphasis and quotation marks omitted) (quoting Pavia, 626 N.E.2d at 27-28).

In determining whether an insurer's conduct constitutes "gross disregard," "New York State court decisions, as well as decisions of [the Second Circuit], consistently have employed a multifactor test" that was set forth in Pavia. New Eng. Ins. Co., 295 F.3d at 242 (collecting cases); see Pavia, 626 N.E.2d at 28. As set forth in Pavia, the factors to be considered are:

> (1) the plaintiff's likelihood of success on the liability issue in the underlying action;
> (2) the potential magnitude of damages and the financial burden each party may be exposed to as a result of a refusal to settle;
> (3) whether the primary insurer properly investigated the claim and any potential defenses;
> (4) the information available to the primary insurer when the demand for settlement was made;
> (5) any other evidence which tends to establish or negate the primary insurer's bad faith in refusing to settle.

Pavia, 626 N.E.2d at 28. "In weighing [the] factors, the touchstone inquiry is whether there was a high probability that the excess insurer 'would be subject to personal liability because of the [primary] insurer's actions, and whether an excess verdict reasonably could have been

35

predicted.'" Scottsdale Ins. Co. v. Indian Harbor Ins. Co., 994 F. Supp. 2d 438, 452 (S.D.N.Y. 2014) (quoting Pinto v. Allstate Ins. Co., 221 F.3d 394, 399 (2d Cir. 2000)).

In addition, the plaintiff alleging a breach of the duty of good faith must establish the existence of a causal connection between the insurer's bad faith and the loss of an actual opportunity to settle. New Engl. Ins. Co., 295 F.3d at 242. In other words, the plaintiff must prove that had the primary insurer acted in good faith, a settlement would have been realized in which the excess insurer would have paid less than the full extent of its excess policy. Quincy Mut. Fire Ins. Co. v. New York Cent. Mut. Fire Ins. Co., 89 F. Supp. 3d 291 (N.D.N.Y. 2014) (citing Pavia, 626 N.E.2d at 28) ("[T]he plaintiff in a bad-faith action must show that the insured lost an actual opportunity to settle the . . . claim at a time when all serious doubts about the insured's liability were removed.").

**B.    Application**

The court considers first whether Twin City breached its duty of good faith to Ohio Casualty and then whether this purported breach caused the loss of an actual opportunity to settle.

1.    Bad Faith

The court finds that Twin City did not demonstrate bad faith—that is, it did not exhibit "gross disregard" in the form of "a pattern of behavior evincing a conscious or knowing indifference to the probability that [Ohio Casualty] would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted." See New Eng. Ins. Co., 295 F.3d at 241 (emphasis, quotation marks and citation omitted). The court reviews the five Pavia factors in turn.

*a.* *The Plaintiff's Likelihood of Success in the Underlying Action*

First, the court considers Aguilar's likelihood of success on the liability issue in the underlying action. Pavia, 626 N.E.2d at 28.

Considering the totality of the facts available to Twin City, which strongly suggested that Aguilar had in fact rear-ended Sanchez, the court finds that Twin City acted reasonably in evaluating the liability picture and concluding that Sanchez was unlikely to be assessed a significant amount of fault.

Although Aguilar asserted that he had not rear-ended Sanchez, the weight of testimony was against him. As described above, Sanchez and Hohl described a rear-end accident, the police report depicted a rear-end accident, and Ruotolo's investigation and reconstruction of the claim concluded that Aguilar rear-ended Sanchez.

Hohl's testimony was particularly significant, because he was a neutral witness with no interest in the outcome of the case. Twin City reasonably believed that a jury would be likely to give weight to his consistent testimony that Sanchez was able to bring his vehicle to a complete stop, without striking the Shurland vehicle, and that Aguilar struck Sanchez from the rear.

Ruotolo's report and his potential and actual trial testimony likewise supported the reasonableness of Twin City's liability analysis. Ruotolo is a well-credentialed and experienced accident reconstructionist, and Turney had had positive experiences working with him on other jury trials. Twin City thus reasonably relied on Ruotolo's investigation, conclusions, and advice in determining that it was unlikely that Sanchez would be assessed a significant amount of liability. Twin City also reasonably assumed that a jury would credit Ruotolo's reconstruction of the accident; although Ruotolo's conclusions contrasted with those of Aguilar's expert witnesses, even Aguilar's experts found that Aguilar was at least partially responsible for the accident.

Consistent with the reasonability of Twin City's assumptions, the verdict in the Underlying Action was a complete surprise—to all those involved.

The fact that it "may have greatly overestimated the likelihood that its policyholder would not be found liable for the accident is indicative of an error in judgment, not bad faith." Vecchione v. Amica Mut. Ins. Co., 711 N.Y.S. 2d 186, 189 (N.Y. App. Div. 2000); see also Pavia, 82 N.Y.2d at 453 (noting that "established precedent clearly bars" claims based on "a mistake in judgment"). Indeed, the facts of this case stand in sharp contrast to other failure-to-settle cases where the primary carrier knows that its insured would likely be held liable. Cf., e.g., Pinto, 221 F.3d at 396 (insured driver had been traveling in wrong direction on one-way street, resulting in head-on collision leading to injuries).

### b. *Magnitude of Damages and Potential Financial Burden*

The second factor concerns "the potential magnitude of damages and the financial burden each party may be exposed to as a result of a refusal to settle." Pavia, 626 N.E.2d at 28.

The magnitude of damages in this case was indeed significant, given Aguilar's catastrophic injuries, but only in the unlikely event of a liability verdict placing significant fault with Sanchez. As explained above, the chance that Sanchez would be held responsible for anything approaching the full value of Aguilar's injuries was slim. As Scanlan testified, obtaining a verdict finding Sanchez even one-quarter responsible would have been a "home run." This is particularly so because the case was being tried in a venue in which liability would be tried before damages. Thus, while the "full" value of the claim necessarily provides the basis for assessing the "pure exposure value" of the claim, it is not a meaningful number in evaluating this factor in the "gross disregard" analysis.

Up until the jury verdict, Twin City's reserve was set at $500,000, which was equivalent to the overall valuation it put on the case. Ohio Casualty did not establish any reserve, and did not inform its reinsurer of the claim, until after the liability verdict. These were reasonable choices by both insurers—if there was a 50 percent chance of a zero-fault, zero-dollar verdict, and a 50 percent chance of a verdict assigning Sanchez 10 percent to 20 percent of the fault, that amounts to an overall valuation of $250,000 to $500,000 if the total damages were $5,000,000.

This factor also calls for the consideration of "the financial burden each party may be exposed to as a result of a refusal to settle." New Eng. Ins. Co., 295 F.3d at 241 (quoting Pavia, 626 N.E.2d at 28). Ohio Casualty has pointed out that, if Sanchez were found liable for as little as 20% of a $5,000,000 verdict, the Twin City policy would be exhausted. From there, any increase in fault or damages would be within the excess layer. But the mere fact that some damages might spill over into the excess layer does not establish bad faith. If Twin City had reason to believe that Sanchez was likely to be found 25 percent liable (the "home run" scenario) for a $5,000,000 verdict, that would mean an apportionment of $1.25 million. Twin City would be responsible for $1 million of that amount, and Ohio Casualty would only be responsible for $250,000. Twin City would be responsible for four times the amount that Ohio Casualty would be called upon to pay were such an unlikely verdict to be rendered. In order for Ohio Casualty's exposure to be greater than Twin City's, the jury would have had to return a truly extraordinary verdict.

Finally, the mere fact that the full value of Aguilar's injuries was significant does not outweigh the other factors. Twin City was not obligated to ignore the liability facts and pay out its policy limit merely because Aguilar was seriously injured. Pavia, 626 N.E.2d at 28 ("[I]t does

not follow that whenever an injury is severe and the policy limits are significantly lower than a potential recovery the insurer is obliged to accept a settlement offer.").

### c.    Twin City's Investigation and Potential Defenses

The third Pavia factor instructs the court to consider "whether the primary insurer properly investigated the claim and any potential defenses." Pavia, 626 N.E.2d at 28.

As this court noted at the summary judgment stage, Twin City's investigation of Aguilar's claim appeared to be thorough and professional. (Memorandum and Order (Dkt. 81) at 16.) The evidence presented at trial confirmed the court's belief. Twin City hired qualified, experienced defense counsel to investigate and defend the Underlying Action. Defense counsel, Lewis Johs, conducted extensive discovery, including taking depositions of all key witnesses. Twin City also hired numerous experts in support of the defense. As indicated by Lewis Johs' final pretrial report, it hired five experts on medical and damages questions. It also retained George Ruotolo, an experienced accident reconstructionist. There is nothing in the record to suggest any inadequacies in Twin City's investigation of the claim and potential defenses. Cf. Pinto, 221 F.3d at 397 (insurer did not depose plaintiff, and defense counsel "expressed surprise" at her trial testimony); Young v. Am. Cas. Co., 416 F.2d 906, 909 (2d Cir. 1969) (insurer did not interview policyholders or their employees, or review records).

### d.    Information Available to Twin City

The fourth Pavia factor asks the court to determine what information was available to the primary insurer when the demand for settlement was made. Pavia, 626 N.E.2d at 28.

Here, as discussed in greater detail below, the court finds that there was no actual opportunity for settlement. Nonetheless, the court has considered the information available to Twin City on the three occasions that have been identified as potential settlement

opportunities—in 2010, 2012, and 2013. The court finds that at the time of each of these purported settlement opportunities, Twin City reasonably believed that it was highly likely to obtain a complete defense verdict. At each of those three times, it was also aware of the substantial workers compensation lien, which would make it difficult for the parties alone to agree on a settlement number.

e. *Other Evidence Tending to Establish or Negate Twin City's Bad Faith in Refusing to Settle*

The final Pavia factor encourages the court to consider whether there is any additional evidence that relates to the primary insurer's bad faith—or lack thereof—in refusing to settle. Pavia, 626 N.E.2d at 28.

Although Aguilar's injuries were likely to make him a sympathetic plaintiff, the jury did not (and could not) learn of those injuries during the liability phase of the trial. As discussed above, Supreme Court, Kings County is a bifurcated venue, so no damages facts were presented to the jury during the liability phase. In fact, the trial judge ordered Aguilar to wear his prosthetic leg and long pants, so that the jury would not see him on crutches, or see the prosthetic if he wore shorts. Nor was Sanchez the lone defendant in the case. Shurland was also held in the case until the liability verdict. Thus, the jury would not be (and was not) presented with (1) a plaintiff that it knew had suffered severe injuries; and (2) only one source from which to award damages for those injuries. Cf. New Eng. Ins. Co., 295 F.3d at 244 (noting that the plaintiff had "profoundly disturbing" injuries and that the policyholder was in the "(unenviable) position as the sole remaining defendant at trial"). Neither of those facts was present in the Underlying Action.

At trial, Ohio Casualty underscored that it had not received all of the information that Twin City had in its possession. But it put forward no evidence showing that any purported failure to share information had any effect on the Underlying Action. Indeed, the purported lack of information did not stop Ohio Casualty from sending its "hammer letter" in March 2013, demanding that Twin City settle the case. And in any case, Twin City's decision to proceed to trial was supported by the totality of the contemporaneously available information—including any information that was purportedly not shared with Ohio Casualty—not undermined by it. At most, the fact that Ohio Casualty, which had chosen to keep its file as "record only," did not have all of the information that Twin City did simply lessens the impact of the fact that Ohio Casualty shared Twin City's view of the case. It does not alone establish bad faith.

### 2. Opportunity to Settle

Even if the court were to find that Twin City had acted in bad faith, it cannot be held liable here unless its purported "gross disregard" cost an "actual opportunity" to settle the Underlying Action within the policy limit. CBLPath, 900 N.Y.S.2d at 966 (affirming summary judgment where there was no demand within policy limits, even assuming that there was evidence of bad faith). Although Ohio Casualty has pointed to three potential settlement opportunities prior to the liability verdict, the court finds that the evidence in the record demonstrates that none of these overtures presented an actionable opportunity to settle.

#### a.     Late 2010 or Early 2011

The first purported settlement opportunity relates to Michael Finkelstein's communication to John Horan, in September 2010, that Aguilar might be willing to settle the case for a "six-figure" sum. Although the record shows that Michael Finkelstein did broach the

possibility of settlement, and discussions followed, there was no actual opportunity to settle, and thus, no opportunity lost.

First, Michael Finkelstein never made a settlement demand, and was never authorized to make one. Additionally, even if he had made a demand, he never could have accepted an offer without confirmation that there was no excess insurance. Not only did he lack such confirmation, but it would have been impossible to obtain such an affidavit, because there was excess insurance.

Second, Twin City followed up on Michael Finkelstein's settlement overture by instructing counsel to contact him and obtain a demand. Indeed, Horan had multiple conversations with Michael Finkelstein about settlement. (See Trial Tr. at 249:10-15 ("I spoke to him numerous times over the course of the case. . . . He never gave me a specific settlement demand.").) The attorneys who testified (both plaintiff's counsel and defense counsel) made it clear that a case cannot settle without a demand from the plaintiff. But this was not a situation in which Twin City simply ignored Michael Finkelstein's settlement overture because it was not technically a "demand." Instead, it followed up, attempting to get a demand from him. If there had been an actual possibility of settling, Finkelstein would have come forward with a number.

Additionally, the workers compensation lien was an obstacle to settlement. The lien and attorney fee would have eaten up any settlement below $500,000 absent PMA's agreement to waive or compromise its lien. Horan reached out to PMA, but the company refused to compromise the lien.

Thus, despite Twin City's best efforts, there was no opportunity to settle the case in late 2010 or early 2011.

### b. 2012

The next purported opportunity to settle the case came in spring 2012, when Scanlan suggested, at a pretrial conference, that the case could possibly settle for an amount that would net $250,000 to Aguilar. The uncontroverted trial testimony of multiple witnesses, however, was that she made no actual demand.

Moreover, the workers compensation lien continued to complicate the settlement landscape. Adding the lien to the $250,000 would have yielded a number around $687,000. Any settlement would additionally need to cover an attorney fee to Jacoby & Meyers for obtaining the settlement for Aguilar. Based on these numbers, Turney concluded that it would take about $1 million to settle the case. But there was no actual demand for that amount—or for any other amount—and thus no actual opportunity to settle the case. See Emp'rs Mut. Cas. Co. v. Key Pharms., 75 F.3d 815, 823 (2d Cir. 1996) (finding that primary insurer could not be held liable for excess settlement where there had been "no genuine offer to settle").

Scanlan testified that, even if Lewis Johs had attempted to accede to such a settlement, she would not have been able to accept it. She could not have settled the case without confirming that there was no excess insurance—and there was, in fact, excess insurance. Scanlon would not have been able to settle the case for a $250,000 net to Aguilar if it were known that there was $5 million in total available insurance.

Thus, there was no opportunity to settle the case in 2012.

### c. 2013

Finally, in March 2013, Scanlan indicated to defense counsel that she intended to make a "formal demand" of greater than $1 million, but that she could potentially settle the case for $850,000. That formal demand never came, but the reference to the $850,000 was the closest to

an actual settlement demand that Aguilar's attorneys ever made, and Twin City interpreted it as such. Accordingly, Twin City presented a counteroffer.

Once again, though, there was no actual opportunity to settle. When John Horan conveyed Twin City's offer, Scanlan immediately shut him down, explaining that the $850,000 was "off the table" and that the case would be tried. Further, Scanlan testified that she would not have been able to accept $850,000 even if it had been offered. She lacked the authority to do so, and again, could not have agreed to any settlement without full information about available insurance, which she did not have at the time of her $850,000 overture.

Thus, there was no opportunity to settle the case in 2013.

### d. Any Other Time

Multiple witnesses testified that Aguilar's attorneys never made any settlement demand prior to the liability verdict. This testimony was uncontroverted. Moreover, Aguilar's attorneys testified that Aguilar had no interest in settlement. These facts demonstrate that there was no actual opportunity to settle the claim within the Twin City limit, and hence that no opportunity was lost.

Additionally, the events that followed Scanlan's $850,000 proposal demonstrate that neither of the earlier purported settlement opportunities could have been fruitful. Negotiations were shut down as soon as Twin City attempted to make a concrete offer. Scanlan explained at trial that this was not due to the amount or timing of the Twin City offer—which she characterized as "generous"—but rather due to Aguilar's insistence on going to trial and lack of interest in settlement. There is no evidence in the record to support an inference that, had a settlement offer been made at an earlier date, it would have received a different reception, and any assertions to the contrary are purely speculation.

Ohio Casualty has posited that Twin City could and should have made settlement offers in the absence of settlement demands. But the record is devoid of evidence to suggest that such an offer would have been accepted. Moreover, there is no requirement for an insurer to initiate negotiations by offering money when there has been no demand. Multiple witnesses offered uncontroverted testimony that the standard practice in the insurance industry and tort litigation field is for the plaintiff to make the first demand. In the absence of a concrete settlement demand, and given the serious liability hurdles to Sanchez's case, it was reasonable for Twin City to elect to take the case to trial.

In New England Insurance, the Second Circuit reaffirmed that an insurer has an affirmative obligation to "pursue" settlement negotiations. 295 F.3d at 247 (citing, inter alia, Young, 416 F.2d at 910). But that obligation does not equate to an obligation to initiate settlement negotiations by making an offer without having received a demand. Both New England Insurance and Young involved actual demands tendered by the claimants. In New England Insurance, the plaintiffs had made a policy-limit demand, which the insurer ignored. 295 F.3d at 235, 245. In Young, the plaintiff demanded double the policy limit, and the insurer never made a counteroffer or informed the plaintiff that the demand exceeded the limit. 416 F.2d at 909. Here, where Aguilar never made a settlement demand, this line of case law is inapposite. To the extent that it is relevant it all, Twin City satisfied its obligation by instructing defense counsel to solicit demands from Aguilar's attorneys and by following up on each and every settlement overture received from Aguilar's attorneys.

Additionally, throughout the case, the workers compensation lien was viewed by all parties as a significant impediment to settlement. Despite the fact that such liens are subject to a statutory reduction for attorney fees and no-fault reimbursement, witnesses testified that such

reductions are taken <u>after</u> the settlement is paid. Moreover, a case cannot settle without the sign-off of the workers compensation carrier, and that sign-off was not forthcoming. The testimony made clear that both Aguilar's counsel and Twin City viewed the lien as an obstacle and PMA's resolute insistence on recovering the maximum amount of the lien as an impediment. Even the trial court shared this view and ordered PMA to attend pre-trial conferences in an attempt to resolve the matter through settlement. The court finds that it cannot have been bad faith for Twin City to have missed a purported settlement opportunity when everyone involved in the claim actually believed that the lien was an obstacle to settlement. See <u>Pavia</u>, 626 N.E.2d at 29 (evidence that, in hindsight, insurer should have responded differently to settlement demand "amounted to mistaken judgment" and did not constitute bad faith).

* * *

The court thus concludes that Twin City did not act in bad faith. In fact, the evidence shows that it diligently investigated the accident and prepared a thorough defense on behalf of Sanchez, and that it reasonably concluded that Aguilar was likely to be found liable for the overwhelming percentage of fault, if not the entirety of the fault, for the rear-end collision. Accordingly, Twin City expected there to be little to no exposure to the excess policy. That Twin City was mistaken in its expectations does not mean that it acted with gross disregard for Ohio Casualty's interests.

Additionally, Twin City's actions did not cause the loss of any actual opportunity to settle. The evidence at trial showed that no such opportunity existed. Twin City solicited settlement demands, but Aguilar's attorneys made no demands. Aguilar's attorneys were not authorized to make demands and they were not in a position to accept any settlement offers without first confirming that there was no excess insurance. To the extent that inadequacies and

errors may be found in Twin City's handling of the Underlying Litigation, there is no causative link between such purported failures and Ohio Casualty's ultimate payment.

## III.   CONCLUSION

For the foregoing reasons, the court finds that Twin City did not breach its duty of good faith to Ohio Casualty.  The Clerk of Court is respectfully directed to enter judgment for Defendant Twin City.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
　　　June 21, 2019

NICHOLAS G. GARAUFIS
United States District Judge